**Mark David BARSHAW, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 03–09–00079–CR.**

Court of Appeals of Texas,
Austin.

Aug. 31, 2010.

Scott K. Stevens, Stevens & Stevens, Attorneys at Law, P.C., Gatesville, TX, for Appellant.

Bob D. Odom, Assistant District Attorney, Belton, TX, for Appellee.

Before Chief Justice JONES, Justices WALDROP and HENSON.

## OPINION

J. WOODFIN JONES, Chief Justice.

A jury found appellant Mark David Barshaw guilty of sexual assault, and the trial court assessed his punishment at twelve years' imprisonment. We reverse the judgment of conviction and remand for a new trial because the trial court permitted an expert witness to testify that the class of persons to which the complainant belongs tends to be truthful.

## BACKGROUND

On December 18, 2007, the complaining witness, K.B., was living with her mother, Debra Berndt, in Belton. K.B. is mentally retarded and functions at approximately a ten-year-old level, although she was twenty-one years old at the time. Berndt was employed as the manager of a convenience store. She testified that it was her daily routine to leave home for work at about 5:00 a.m. She would return home at 7:30, pick up K.B., and return to the store. K.B. would then take a bus from the store to the mental health-mental retardation center where she was employed. K.B. would return to the store by bus after work, and the two would go home together.

Appellant, who worked in the maintenance department of the convenience store company, regularly stopped by Berndt's store on his way to work. Berndt had employed appellant on several occasions to work on her home air conditioner/heater. Berndt testified that she generally kept the house unlocked, and that appellant was authorized to enter the house to do his repairs. Appellant and K.B. had met, and K.B. was sometimes alone at the house when appellant was there. Appellant had most recently been to Berndt's house to repair her heater on December 15 or 16.

Berndt testified that appellant came to the store on the morning of December 18 and asked her how her heater was working. She told him that it was working fine. Berndt said that she did not ask or authorize appellant to go to her house that morning. Later, Berndt drove home at the usual time to get K.B. As they were driving back to the store, K.B. told Berndt that appellant had surprised her that morning. Berndt testified that she asked K.B. what she meant, and K.B. replied, "Well, he woke me up." Berndt did not testify in further detail about this conversation, but she stated that after hearing what K.B. told her, she called the police.

K.B. testified that she knew appellant as the person who fixed the air conditioner. She remembered an incident (but could not remember the date) when appellant came to her room and woke her. She said that appellant took off her pajama tops and bottoms and her underpants. Then, as she laid in bed, appellant touched her breasts and legs. He also spread her legs and "touched [her] pelvis." She indicated that appellant rubbed her breasts and her "pelvis." She did not know if appellant put his fingers in her "pelvis." K.B. testified that appellant did not remove his clothes, and that he helped her put her pajamas back on after touching her. K.B. recalled telling her mother what had happened and going to see a doctor.

Deborah Kleypas was the sexual assault nurse examiner who examined K.B. on the morning of December 18. Kleypas testified that as part of her exam, she had K.B. recount what had happened to her. Reading from her written report, Kleypas described K.B.'s account:

[K.B.] told me that "He," Mark, "woke me up." I asked her, "Where were you when he woke you up?" She told me that "I was in my bed in my bedroom. He did a massage, a body massage. He touched my—these," then she pointed to her breasts on herself, "and he touched my pelvis." She then pointed to her genital area on herself. "What did he touch your pelvis with?" I asked that question. "His hand. He touched my pelvis with his fingers. He was rubbing on it." She demonstrated when she told me that he was rubbing on it, she demonstrated by putting her hands between [her] legs and making a back and forth motion. "And that he touched me on the inside of my clothes."

Kleypas testified that during her physical examination of K.B., she observed what she described in her report as an abrasion to the posterior fourchette approximately 1.75 centimeters long and 1 centimeter wide. She said that this injury was consistent with the events K.B. had described. Kleypas also testified that it was not unusual for children or even adults to describe an assault as a touching, when the evidence indicates that there was penetration. A labial swab collected by Kleypas was found to have K.B.'s blood on it. K.B.'s blood was also found on her pajamas and on a bed sheet, but not on her underpants, all of which were collected by the police after being dispatched to Berndt's residence. No one else's DNA was found on any of these items.

Pammy Porter was K.B.'s MHMR caseworker. She testified that K.B. had regularly received "exploitation training," which Porter described as "don't answer the door for strangers; don't talk to strangers; when you're being touched inappropriately, you have the right to say no, just things like that." Porter testified that she had never discussed "dating relationships" or "romantic relationships" with K.B., and she indicated that K.B.'s understanding of such matters would be that of a nine or ten-year-old. Porter testified that MHMR does not engage in sex edu-

cation because "parents have a real issue with us training our consumers on sex." As regards sexual activities or contact, Porter said that K.B. "may not understand exactly what is going on."

Rebecca Barthlow is an MHMR psychologist. She testified that K.B. had a nonverbal IQ of 67, which she estimated was ten points higher than K.B. would score using a standard IQ test. K.B.'s adaptive behavior test score was 51, which Barthlow believed was "much more in line with what we would think her true IQ is." Barthlow testified that K.B. is "at great difficulty and a great disadvantage compared to someone of average ability as far as understanding social concepts, understanding very basic common sense kinds of things...." She believed that K.B. was "closer to the moderate range of mental retardation [as] opposed to the mild range." Barthlow confirmed Porter's testimony regarding the lack of sex education at MHMR. Asked by the prosecutor if K.B. was "capable of either appraising the nature of an act or being able to resist it," Barthlow replied, "I don't believe so." [1]

Appellant acknowledged going to Berndt's house on December 18. He testified that he had to improvise the repair he made to Berndt's heater due to the age of the unit, and that he went to Berndt's residence that morning to make sure that the repair had been effective and the heater was working properly. He said that he spoke to Berndt at the store and told her what he was going to do, but she was busy at the time and may not have heard him. Appellant testified that upon entering the house, he went straight to the laundry room where the heating unit was located. Appellant said that while working, he acci-

dentally dropped a metal panel, which made a "pretty loud noise." Appellant testified that after checking the heater and determining that it was working properly, he was putting away his tools and preparing to leave when K.B. walked into the laundry room. K.B. was wearing a T-shirt and shorts. She told appellant that it was her birthday, and they had a brief conversation about baseball.[2] Appellant testified that as he left the house, he congratulated K.B. on her birthday and gave her a kiss on the cheek. He denied touching K.B.'s breasts or genitals. He also denied knowing that she was mentally retarded.

The evidence reflects that appellant returned to Berndt's house the next morning, December 19. Appellant testified that he did so to retrieve a tool that he left the previous day.

Appellant was indicted for entering Berndt's habitation without her effective consent and committing or attempting to commit sexual assault. *See* Tex. Penal Code Ann. § 30.02(a)(3) (West 2003) (burglary of a habitation). The trial court's jury charge also included an instruction on the lesser included offense of sexual assault. *See id.* § 22.011(a)(1)(A), (b)(4) (West Supp. 2009). The jury did not convict appellant for the alleged burglary, but it found him guilty of the lesser included offense.

## DISCUSSION

In *Yount v. State,* the court of criminal appeals held that evidence rule 702 does not permit an expert to give an opinion that the complainant or a class of persons to which the complainant belongs is truthful. 872 S.W.2d 706, 712 (Tex.Crim.App.

---

1. The prosecutor did not specify the type of act she was referring to, but we infer that she was inquiring into K.B.'s capacity for appraising or resisting a sexually assaultive act.

2. Berndt testified in rebuttal that K.B.'s birthday is December 30, and that she knows this.

1993); Tex.R. Evid. 702. In *Yount,* a pediatrician testified that she had interviewed and examined hundreds of children who claimed to have been sexually abused and had seen very few cases where the child was not telling the truth. 872 S.W.2d at 707–08. The court ruled that this testimony should not have been admitted because "[a]n expert who testifies that a class of persons to which the victim belongs is truthful is essentially telling the jury that they can believe the victim in the instant case as well. This is not 'expert' testimony of the kind which will assist the jury under Rule 702." *Id.* at 711.

■ Appellant contends that the trial court abused its discretion and violated *Yount* by permitting Barthlow to testify that mentally retarded persons, as a class, tend to be truthful. This contention is based on the following exchange between the prosecutor and Barthlow:

Q. What about people that suffer from mental retardation in their ability to fabricate or make up elaborate stories; what do you see with that?

A. Generally speaking if you're— when we're dealing with mental retardation and there's not anything going on, there's just a diagnosis of mental retardation, primarily, there's not a personality disorder or something adding to that, it's been my experience that folks with mental retardation can be painfully honest, really. I mean, it's like a little kid who looks at somebody and says in the supermarket, "You're really old," or, you know, whatever little kids do.

At this point, defense counsel objected, "You can't have somebody come in and testify to a class of people are truthful." The prosecutor responded that cross-examination had raised the issue of how mentally retarded persons "adapt." She added, "We have specifically the element to prove that she's suffering from a mental

disease or defect, and that as a result that she's incapable of either appraising the situation or the nature of the act [or] resisting it, and as such I think it's admissible." The court overruled the defense objection and Barthlow continued:

Q. (By [prosecutor]) Where were we?

A. I was discussing individual's mental retardation, and kind of their ability to make up things. I'm not going to say that it would never happen. I mean, anybody is capable of making up something, but it's very simplistic in nature. It would be—like I said, it would be like a lie that a child would tell, a story a child would make up. It would be very easy as an adult or a parent to kind of see through that when you're thinking of that. And, again, it's been my experience in the hundreds and hundreds of people with mental retardation that I've seen, that it's more going to be that they're painfully honest. They haven't learned the social skills and probably never will to know when you should lie or when it would be socially appropriate to not tell the truth because it might hurt someone's feelings, or things of that nature, to hold things back.

The State argues, as it did below, that expert testimony regarding the nature of mental retardation and the ability of mentally retarded persons to function at an adult level was relevant to the issue of K.B.'s ability to effectively consent to the sexually assaultive acts appellant was accused of committing. *See* Tex. Penal Code Ann. § 22.011(b)(4) (consent is not effective if actor knows that as result of mental disease or defect complainant is incapable either of appraising nature of sexually assaultive act or of resisting it). Whatever validity there may be in this argument, it does not speak to appellant's contention. Barthlow's challenged testimony—that

mentally retarded persons are "painfully honest" and that any story that a mentally retarded person might "make up" would be "simplistic" and easily seen through— had no relevance to K.B.'s capacity to effectively consent within the meaning of section 22.011(b)(4).

The court of criminal appeals has recognized that some witnesses—the court specifically referred to children and mentally retarded persons—are viewed by society as "impaired." *Schutz v. State,* 957 S.W.2d 52, 70 (Tex.Crim.App.1997). When such a witness is expected to testify, expert testimony should be permitted in the offering party's case in chief concerning the ability of the class of persons suffering the "impairment" to distinguish reality from fantasy and to perceive, remember, and relate the kinds of events at issue in the case. *Id.* The court emphasized that such testimony should be limited to the "impaired" class's *ability* to accurately relate events and should not extend to the class's *tendency* to do so; the latter would violate the holding in *Yount. Id.* In her challenged testimony, Barthlow was not questioned about and did not discuss the ability of mentally retarded persons to accurately perceive, recall, and relate events. Instead, she testified to their tendency to be "painfully honest," even to the point of being socially inappropriate.

Barthlow's testimony that mentally retarded persons are honest to a fault and cannot fabricate elaborate stories was simply another way of testifying that mentally retarded persons are, as a class, truthful. Accordingly, this violated the holdings in *Yount* and *Schutz.* The trial court abused its discretion by overruling appellant's objection and admitting the testimony.

■■■ Having found error, we must decide if it affected appellant's substantial rights. *See* Tex.R.App. P. 44.2(b). In assessing harm, our focus is not on whether the outcome of the trial was proper despite the error, but on the error's impact on the jury. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App.2000). We will not reverse a conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had only a slight influence. *Schutz v. State,* 63 S.W.3d 442, 444 (Tex.Crim.App.2001).

This was a "she said, he said" case. Although there was physical evidence that K.B. had been penetrated in some manner, there was no physical evidence linking appellant to that penetration, and the outcome ultimately turned on the jury's assessment of the relative credibility of the two principal parties' testimony.

Appellant was, on the face of it, a credible witness. He was fifty years old at the time of the trial, married, and the father of a daughter who was then seventeen years old. Appellant grew up in a military family and himself spent twenty years in the Army, receiving a Bronze Star. He earned his GED while in the Army, and he earned a college degree following his retirement. Appellant had no criminal record before his arrest in this case, and several witnesses testified to his good character. There was evidence, however, that appellant had been dismissed from his job at the convenience store chain after he approached two female employees with mistletoe following the company Christmas party. There were also some inconsistencies between appellant's trial testimony and the statements he made to the police following his arrest.

K.B. was, to repeat the court of criminal appeals' observation in *Schutz,* an "impaired" witness. There were several inconsistencies and omissions in her testimony, and she did not testify that she had been penetrated. It would be understand-

able for the jury to be concerned that K.B.'s account was mistaken or perhaps even a fabrication. Although neither prosecutor mentioned Barthlow's testimony during final argument, we cannot avoid the conclusion that the jury, in assessing K.B.'s credibility, likely gave significant weight to the expert's opinion that mentally retarded persons are generally truthful.

 A conviction must be reversed for nonconstitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. *Burnett v. State,* 88 S.W.3d 633, 637 (Tex.Crim.App.2002). "Grave doubt" means that the matter is so evenly balanced as to be in virtual equipoise. *Id.* In cases of grave doubt as to harmlessness, the appellant must win. *Id.* at 638. In this cause, we have grave doubt as to the error's harmlessness, which is another way of saying that we do not have a fair assurance that the error did not substantially influence the jury.

Because of our disposition of this issue, we do not address appellant's other issues on appeal. The judgment of conviction is reversed and the cause is remanded to the district court for a new trial.

Dissenting Opinion by Justice HENSON.

DIANE M. HENSON, Justice, dissenting.

I agree with the majority that the trial court abused its discretion in permitting Barthlow to testify that mentally retarded persons, as a class, tend to be truthful. *See Schutz v. State,* 957 S.W.2d 52, 70 (Tex.Crim.App.1997) ("*Schutz I*"); *Yount v. State,* 872 S.W.2d 706, 711 (Tex.Crim. App.1993). However, because I would hold that the error is harmless, I respectfully dissent.

A trial court's evidentiary rulings, including those involving error under *Schutz I* and *Yount,* are subject to harmless error analysis. *See Schutz v. State,* 63 S.W.3d 442, 443 (Tex.Crim.App.2001) ("*Schutz II*") (holding that admission of testimony that was "direct comment on the truthfulness of complainant's allegations" was harmless error). The rules of appellate procedure provide that any error other than constitutional error "that does not affect substantial rights must be disregarded." Tex.R.App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, the court has a fair assurance that the error did not influence the jury, or had but a slight effect. *Schutz II,* 63 S.W.3d at 444.

With regard to violations of *Schutz I* and *Yount,* the "danger posed by the erroneous admission of expert testimony that was a direct comment on the complainant's credibility was that the jury could have allowed that testimony to supplant its decision." *Schutz II,* 63 S.W.3d at 445. In evaluating whether the jury's decision on the credibility of witnesses was supplanted, the court must consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence. *Id.* Additionally, courts may also consider other factors, including the trial court's instructions to the jury, the theories of the case that the State and defendant have espoused, and arguments to the jury. *Id.* at 444–45.

*Evidence Admitted at Trial*

The initial inquiry concerns the evidence admitted at trial, including the evidence supporting the verdict. The majority states that this was a "she said, he said" case. However, there was a great deal of additional evidence and testimony that the

jury could have considered when determining the relative credibility of the witnesses and reaching its verdict.

Regarding the evidence supporting K.B.'s testimony, K.B. testified at trial that Barshaw had removed her pajamas and underwear and had then touched her breasts and her "pelvis." Though K.B. functions at roughly the level of a ten-to-twelve year old with a verbal IQ of 67 and an estimated actual IQ in the fifties, her testimony at trial was consistent with both the initial outcry she made to her mother and to the statements she gave to the investigating officer and to Kleypas, the SANE nurse.[1]

Further, the physical evidence at trial was also consistent with K.B.'s testimony. Kleypas examined K.B. on the same day as the alleged incident. While K.B. indicated that she did not remember whether Barshaw had penetrated her when touching her pelvis, Kleypas's examination revealed an abrasion inside of K.B.'s labia majora that could only have been caused by penetration.[2] Kleypas testified that the abrasion was recent, as the skin in the affected area of the body heals very quickly. According to Kleypas, the abrasion would have caused bleeding at the time it happened, and clothing put up against the area would have blood on it. Forensic scientist Patricia Retzlaff found blood stains on K.B.'s pajama shorts and on her bedsheets, which DNA tests showed was K.B.'s blood.[3] This evidence is consistent with K.B.'s testimony.

While Barshaw's testimony contradicted that of K.B., there is other evidence in the record besides K.B.'s testimony that conflicts with Barshaw's testimony. Specifically, the testimony of Berndt, K.B.'s mother, differs from Barshaw's in several important respects. According to Barshaw, on the morning of the alleged incident, he saw Berndt at the store where she works and told her that he needed to check on the heater in Berndt's home; he then proceeded to her home and encountered K.B. there. Berndt, however, testified that Barshaw asked about the heater, but that she told him that there were no problems with it, and that she did not give him permission to go to her home that day. Barshaw also testified that he returned to Berndt's home—where K.B. was—the next day to look for his "multimeter," a piece of equipment he thought he had left behind. While Barshaw testified that he drove to the home and then found the multimeter in his truck, Berndt, who had followed him, testified that Barshaw instead attempted to enter the home, finding the door to be locked. She relayed this information to 911 as the incident was in progress. In addition, Barshaw testified that he did not know as of the date of the incident that K.B. was mentally retarded, despite having had several conversations with K.B. Berndt, however, testified that it was "common knowledge" that K.B. was mentally challenged, and Kleypas testified that she could tell that K.B. exhibited signs of developmental delay when she first met her. This conflicting testimony provides a

---

1. While defense counsel alluded during closing to a statement K.B. made that she was "mad" at Barshaw prior to her outcry, the record contains no other indication of a motive for K.B. to lie or to concoct her story.

2. There is no evidence in the record to indicate that K.B. was sexually active at the time of the alleged incident. Porter, K.B.'s MHMR caseworker for two years, stated that to her knowledge, K.B. had never had a romantic or sexual relationship.

3. There was no blood, however, on the panties K.B. indicated she was wearing after the incident, nor was the DNA of any other person found on K.B.'s clothing or bedsheets.

basis for the jury to discredit Barshaw's credibility even without K.B.'s testimony.

In addition, portions of Barshaw's own testimony place him at the scene of the incident. Barshaw himself admitted that he was in the house alone with K.B. on the date of the incident in question, and consequently had the opportunity to engage in the charged acts. He further stated that he had grasped her shoulders and given her a kiss on the cheek when she told him it was her birthday.[4] In addition, Barshaw admitted that he returned to the home the next day without having asked Berndt's permission.

Given the testimony and physical evidence admitted at trial, I disagree with the majority that this was simply a "she said, he said" case. Further, even if the outcome rested solely on the jury's credibility assessments of K.B., the fact that the prosecution is grounded on the credibility of the victim, while significant, is not conclusive in determining harm. *Schutz II*, 63 S.W.3d at 446. Even in cases in which credibility is paramount, Texas courts have found violations of *Schutz I* and *Yount* to be harmless where the record as a whole provides adequate assurance that the jury was able to exercise its function to determine the credibility of witnesses. *See id.* (holding error was harmless even though "the case against the appellant rested on the credibility of the complainant").

*Character of the Error*

The next inquiry concerns the character of the error and its relationship to the other evidence. When asked about the ability of mentally retarded people to "fabricate or make up elaborate stories," Barthlow stated:

Generally speaking if you're—when we're dealing with mental retardation and there's not anything going on, there's just a diagnosis of mental retardation, primarily, there's not a personality disorder or something adding to that, it's been my experience that folks with mental retardation can be painfully honest, really. I mean, it's like a little kid who looks at somebody and says in the supermarket, "You're really old," or, you know, what little kids say.

The defense objected, indicating that the "testimony is not relevant because you cannot testify to a class of people being truthful." The trial court overruled the objection, and Barthlow continued:

I was discussing individual's mental retardation, and kind of their ability to make up things. I'm not going to say it would never happen. I mean, anybody is capable of making up something, but it's very simplistic in nature. It would be—like I said, it would be like a lie that a child would tell, a story a child would make up. It would be very easy as an adult or parent to kind of see through that when you're thinking of that. And, again, it's been my experience in the hundreds and hundreds of people with mental retardation that I've seen, that it's more going to be that they're painfully honest. They haven't learned the social skills and probably never will to know when you should lie or when it would be socially appropriate to not tell the truth because it might hurt someone's feelings, or things of that nature, to hold things back. They just say what comes into their minds, very much, again, like a six- or seven-year-old child would. They see something and they make an observation, and they're going

---

4. The date of the incident was December 18th. Berndt testified that K.B.'s birthday is December 30th.

to say that because they haven't learned the social etiquette of when that's appropriate and when that's not appropriate. As recognized above, portions of this testimony involve the propensity of mentally retarded people as a class to be truthful, and are consequently inadmissible under *Schutz I* and *Yount.* However, it is noteworthy that Barthlow equivocated at the start of the statement, saying, "I'm not going to say it would never happen. I mean, anybody is capable of making up something. . . ." *Cf. Long v. State,* No. 12–07–00256–CR, 2009 WL 387018, at \*3, 2009 Tex.App. LEXIS 1090, at \*8 (Tex.App.-Tyler Feb. 18, 2009, no pet.) (mem. op., not designated for publication) (holding error harmful where expert "staked her reputation on her conclusion that there was nothing troubling about the complaining witness's testimony and the State's case"). In addition, the quoted passages constitute the entirety of Barthlow's impermissible testimony. She did not revisit or expand her statements at any other time during the trial, nor did the State attempt to elicit any further testimony on the matter. *See Garza v. State,* No. 05–04–01104–CR, 2006 WL 22882, at \*4, 2006 Tex.App. LEXIS 69, at \*12 (Tex.App.-Dallas Jan. 5, 2006, pet. ref'd) (mem. op., not designated for publication) (noting that "[t]he State did not pursue the matter further" after erroneous admission of *Schutz/Yount* testimony in holding error harmless).

Further, an examination of the relationship of the error to the other evidence in the record indicates that the jury had much more than just Barthow's testimony on which to gauge the credibility of K.B. *See Schutz II,* 63 S.W.3d at 446 (holding error harmless where inadmissible expert testimony was "a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility"). First and foremost, the jury was able to listen to K.B.'s own testimony in its entirety, and to make its own determinations based on their observations of her during her time on the witness stand. The jury was also presented with the physical evidence described above, including evidence that K.B. had been penetrated in a manner consistent with the offense charged. Finally, the jury was able to hear the competing testimony of Barshaw in addition to character witnesses supporting Barshaw in making its determination. While the majority relies on the assertion that Barshaw "was, on the face of it, a credible witness," the fact that the jury was able to evaluate his conflicting testimony reinforces the notion that the jury had a large amount of evidence to consider beyond the testimony of the expert in making its credibility determinations. *See id.* (indicating that harm of error was mitigated by amount of other evidence jury heard, including testimony that defendant "was a truthful, peaceful, law-abiding person who exhibited no unnatural sexual tendencies toward children").

### Jury Instructions

Turning to the instructions given to the jury, the record indicates that the jury was explicitly instructed, "You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony." This instruction reinforced the jury's role in making credibility determinations. *See Wilson v. State,* 90 S.W.3d 391, 394 (Tex. App.-Dallas 2002, no pet.) (noting that "the trial court instructed [the jury] that they were the exclusive judges of a witness's credibility" in finding error harmless).

### Closing Argument

Finally, as noted by the majority, the State did not reference the inadmissible portion of Barthow's testimony during closing. Further, the State began its ar-

gument, "You saw [K.B.] You got to see her in person. And that's important, for you all to see her, to hear her, *and to judge her credibility.*" (Emphasis added.) The State also made other references to the credibility determination at the heart of the case, telling the jury, "You're going to have to decide who you believe, [K.B.], or Mark Barshaw." These statements indicated that the ultimate determination of credibility rested with the jury. *See id.* (noting that "[d]uring closing arguments, the State emphasized to the jurors that they were the judges of [complainant]'s credibility and never referred to [inadmissible] testimony about the percentage of children who lie about being sexually abused" in finding error harmless).

Based on this review of the record as a whole, including the evidence admitted at trial, the character of the error and its relationship to the evidence, the instructions given to the jury, and the State's closing argument, I conclude that there is a fair assurance that the error did not influence the jury, or had but a slight effect. *See Schutz II,* 63 S.W.3d at 444–46; *Wilson,* 90 S.W.3d at 394; *Garza,* 2006 WL 22882, at *4, 2006 Tex.App. LEXIS 69, at *12 (holding *Schutz/Yount* error harmless because jurors were presented with large amount of evidence to consider in making credibility determination, State did not pursue inadmissible evidence after admission of initial testimony, jury was instructed that it was sole judge of credibility of witnesses, and State did not reference *Schutz/Yount* testimony during closing). As I would therefore overrule Barshaw's first issue and proceed to address his remaining issues on appeal, I respectfully dissent.