

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00101-CR

JOSEPH JAMES CRAVER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 16-0317X

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Joseph James Craver appeals his convictions on three counts of aggravated sexual assault of a child.[1] Here, he claims five errors: that the abstract portion of the charge failed, in defining aggravated sexual assault, to include digital penetration of the victim's sexual organ as a way to commit the crime; that the State did not show the outcry witness was properly qualified; that the outcry witness was not qualified to explain grooming to the jury; that the State's detective was allowed to explain certain DNA evidence when the detective was not qualified to do so; and that it was improper to allow testimony that only two to eight percent of child sex-abuse victims lie about their abuse.

We affirm the trial court's judgments,[2] because (1) the failure to include digital penetration in the offense definition in the abstract portion of the jury charge did not cause egregious harm, (2) Craver preserved no complaint regarding the use of Halbrook as the outcry witness, (3) allowing Black's testimony about grooming was within the trial court's discretion, (4) allowing a detective's testimony regarding DNA evidence was harmless, and (5) allowing testimony regarding the percentage of untruthful allegations among child sex-abuse victims was harmless.

Cassandra,[3] the child complainant, was nine years old at the time of trial. She described for the jury several instances of abuse both by Craver and Christopher McCartney.[4] Cassandra

---

[1]*See* TEX. PENAL CODE ANN. § 22.021.

[2]The trial court sentenced Craver, per the jury's recommendation, to ninety-nine years' confinement on each of the three counts. The court then ordered the sentences to run consecutively.

[3]In this opinion, we refer to the child and her relatives by a pseudonym in order to protect the child's identity. *See* TEX. R. APP. P. 9.10.

[4]We affirmed McCartney's convictions in *McCartney v. State*, No. 06-19-00053-CR, 2019 WL 6646380 (Tex. App.—Texarkana Dec. 6, 2019, no pet. h.) (mem. op., not designated for publication).

detailed for the jury how Craver "put his private part in [her] private part, put his finger in [her] private part, and [put] his private part in [her] mouth." These acts, Cassandra testified, took place more than once when she was five to six years old. She described "white stuff," which "didn't feel good at all," coming out of Craver's "private part" on these occasions. There was evidence Cassandra had also been serially abused by McCartney. Cassandra, though, was able to differentiate for the jury abuses by Craver and those by McCartney.[5] For example, she testified that McCartney used lotion as a lubricant, while Craver used saliva for that purpose.

Cassandra's descriptions of sexual assaults by Craver were supported by testimony from Halbrook, the forensic interviewer. Halbrook told the jury that Cassandra told her Craver put his "turtle," Cassandra's word for penis, and fingers in Cassandra's "tutu" or vagina. Halbrook also testified that Cassandra differentiated abuse by McCartney from abuse by Craver.

The sexual assault nurse examiner (SANE) who conducted a sexual-assault examination of Cassandra testified that Cassandra described only abuses by McCartney. The nurse also described Cassandra as having "hymenal remnants, which means that parts of her hymen were missing." In a child of Cassandra's age, that could only be caused by "a penetrating injury" and was "suggestive of sexual abuse."

Savannah Quinn was a counselor at the Child Advocacy Center (CAC) where Cassandra was interviewed. Quinn testified that she worked as a therapist with Cassandra for about a year, holding twenty-three sessions. Quinn testified that it took seventeen or eighteen therapy sessions

---

[5]For example, she said that, on one occasion, McCartney penetrated her anus, but she made no such allegation against Craver.

for Cassandra to begin to disclose the sexual abuse she endured. After her year of therapy with Quinn, Cassandra moved to Mississippi[6] and continued therapy there for three more years. Quinn described Cassandra as exhibiting multiple signs of post-traumatic stress disorder[7] and being consistent in her descriptions of the "core details" of abuse by Craver.

*(1)      The Failure to Include Digital Penetration in the Offense Definition in the Abstract Portion of the Jury Charge Did Not Cause Egregious Harm*

Craver was charged with three counts of aggravated sexual assault of a child. The indictment alleged that Craver, on separate occasions, caused his sexual organ to penetrate Cassandra's mouth and sexual organ and that Craver caused his finger to penetrate Cassandra's sexual organ. However, in the trial court's charge to the jury, the abstract section defined aggravated sexual assault only as "intentionally or knowingly caus[ing]" "[t]he penetration of the mouth, anus, or sexual organ of a child younger than 14 years of age by the sexual organ of the actor." Craver points out that there was no definition instructing the jury that digital penetration of Cassandra's sexual organ by Craver was also aggravated sexual assault of a child.[8] Craver claims error in the trial court's failure to define, in the abstract paragraph, each of the offenses for which he was charged and convicted.

We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error

---

[6]Cassandra's family members testified that Cassandra and her siblings had all been removed from the home when the sexual abuse was reported.

[7]Quinn testified that Cassandra "met seven of the eight criteria" for post-traumatic stress disorder, as defined by the Diagnostic and Statistical Manual for Counseling.

[8]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i).

4

occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

The level of harm necessary to require reversal due to jury-charge error is dependent on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Here, because Craver did not object to the charge, we will not reverse unless the record shows the error resulted in egregious harm, *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), such that he did not receive a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. 1984); *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.).

"Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). In making this determination, we review "the entire

jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole." *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed) (citing *Almanza*, 686 S.W.2d at 171). Direct evidence of harm is not required to establish egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

The abstract portion of the charge acts "as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). "Generally, reversible error occurs in the giving of an abstract instruction only when the instruction is an incorrect or misleading statement of a law that the jury must understand in order to implement the commands of the application paragraph." *Id.*

Essentially, the abstract portion of the jury charge did not inform the jury that aggravated sexual assault could be committed other than by penile penetration of the victim.[9] However, the application paragraph for Count II correctly instructed the jurors that, if they found beyond a reasonable doubt that Craver caused his finger to penetrate Cassandra's sexual organ, they must find him "guilty of aggravated sexual assault of a child as charged in the indictment." "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (despite incorrect definition of "knowingly" in abstract instruction, application paragraph correctly instructed jury to find defendant guilty of murder only if found he "intentionally or knowingly caused the

---

[9]One could easily conclude that failure to include, in the abstract portion, digital penetration as a way of committing the offense could not harm, but only benefit, a defendant charged with sexual assault by digital penetration.

6

death").[10]  Regardless of whether the incomplete abstract paragraph constituted jury-charge error, Craver cannot show egregious harm.

"[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.  The rest of the jury charge was without error.  The evidence against Craver was substantial, consistent, and compelling.

We find no indicators of harm in the arguments of counsel.  In its argument, the State referred to the three counts in the application section and stressed that it had proved each element of each distinct allegation.  The State summarized the evidence and emphasized Cassandra's credibility.  Craver, in turn, discussed Cassandra's ages at the times of the allegations, her outcry, and the trial and questioned the consistency of the details to which she testified.  Craver suggested that her allegations against him had been conflated with allegations against McCartney and that her memories and allegations against Craver evolved over time.  He pointed out that, initially, Cassandra said Craver abused her only in her home, but later alleged that some abuse occurred in Craver's home.  Most relevant to the point of error, there was no argument specifically impugning the evidence of digital penetration.  Craver's theory was that the evidence was circumstantial and not sufficient to prove his guilt.  In its rebuttal, the State pointed out that, in cross-examining Cassandra, Craver did not question her about the offenses but instead questioned her about details

---

[10]This holding from *Medina* would seem to solve the issue presented.  However, the Texas Court of Criminal Appeals has also long held that we are to review the entire charge and record in gauging the harm, if any, resulting from the charge error.  Though the *Medina* court did not explicitly conduct that analysis, most Texas Court of Criminal Appeals charge-error cases do, as shall we.

of when and where things had happened. In short, there was no challenge to the three ways in which it was alleged Craver committed an offense. The defense was simply that it had not been proved that Craver had abused Cassandra as indicted and that McCartney, instead, was responsible for all the improper sexual acts.

The record as a whole contains no factors significant enough to establish egregious harm. Therefore, any such error did not subject Craver to egregious harm. *See Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002) (the harmfulness of jury charge-error should be measured against likelihood that jury's verdict was actually based on alternative available theory of culpability not affected by erroneous portions of charge).

We overrule this point of error.

*(2)      Craver Preserved No Complaint Regarding the Use of Halbrook as the Outcry Witness*

Craver also argues that the trial court erred in allowing Melanie Halbrook, the CAC forensic interviewer, to testify as the outcry witness about allegations Cassandra made against Craver.[11] The trial court held a hearing on whether Halbrook was the appropriate outcry witness. At no point did Craver lodge any objection. At the conclusion of the hearing, Craver told the court,

> Your Honor, I would state for the record, [the State] did send me two notices [of possible outcry witnesses], one of [an aunt of Cassandra], one of Ms. Halbrook. Just based on how she has done this, I anticipated Ms. Halbrook being the only outcry witness, and the notice that she gave me did track what the testimony was this morning.

---

[11]*See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (Supp.).

Since Craver posed no objection in the trial court to Halbrook as the outcry witness, this appellate complaint is not preserved for our review. *See* TEX. R. APP. P. 33.1.

We overrule this point of error.

*(3)*     *Allowing Halbrook's Testimony about Grooming Was Within the Trial Court's Discretion*

Craver further argues that the trial court erred when it allowed Halbrook to testify about grooming, a method abusers can use to curry favor with, or trust from, their victims.[12] Halbrook was found to be an expert in the field of forensic interviewing. Craver claims that this expertise did not extend to the topic of grooming.

The topic of grooming "is a subject matter that may fall within the scope" of "the experience-based study of 'the behavior of offenders who sexually victimize children.'" *Morris v. State*, 361 S.W.3d 649, 656 (Tex. Crim. App. 2011). Further, "[a] person can, through his experience with child-sex abuse cases[,] gain superior knowledge regarding the grooming phenomenon." *Id*. at 666–67.[13] Finally, the court concluded that "expert grooming testimony is useful to the jury." *Id*. at 669.

Here, Halbrook testified about her education, training, and experience. She held a "bachelor's degree in human development with a concentration in child development from the

---

[12]After Craver's objection was overruled, Halbrook told the jury that "[g]rooming is defined as pattern behavior that's meant to normalize behavior. For the offender, it's meant to gain access to those victims, isolate that child, sexualize that relationship and maintain control and secrecy of that relationship."

[13]The witness in question in *Morris* was a Texas Ranger, a member of law-enforcement. From the Texas Court of Criminal Appeals's discussion, though, we find that its conclusion was not limited to members of law enforcement. Rather, the gist of the court's discussion centered on the experience, knowledge, and qualifications of the witness as regards the phenomenon at issue.

9

University of Arkansas." She had trained in "forensic interview protocol" in Texas and Arkansas. She had, as of the trial date, conducted more than 2,000 forensic interviews and attended more than "400 hours of continuing education in the field of child abuse and forensic interviewing." She explained her role at the local CAC and the procedures employed to interview children who had reported abuse. She agreed with the State's characterization that she had "much experience" with victims of child sexual abuse. She described her experiences in interviewing children of different ages and how she had learned that abusers are usually persons known to the victim.

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).[14] Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Error in the admission of evidence is non-constitutional and will be disregarded unless said error affects the accused's substantial rights. *See* TEX. R. APP. P. 44.2(b).

The trial court reasonably could have decided that Halbrook's significant experience dealing with victims of child sexual abuse would have included knowledge of grooming potential

---

[14]This standard of review controls our review of Craver's points of error regarding admission or exclusion of evidence.

10

victims by abusers. There was no abuse of discretion in allowing Halbrook's testimony about grooming. This point of error is overruled.

*(4)      Allowing Black's Testimony Regarding DNA Evidence Was Harmless*

Craver additionally complains of testimony from Lieutenant Cindy Black, an investigator for the Harrison County Sheriff's Department. In describing her investigation, Black said that Cassandra's pajamas and underwear were collected. Black also obtained a buccal swab from Craver to get a sample of his DNA.

Over Craver's objection, the trial court allowed Black to testify that the DNA sample from Cassandra's pajamas and underwear did not match the DNA of either Craver or McCartney, but that the DNA sample did show the presence of PSA, which Black said indicated male DNA.

While Black testified to her experience and training as a law enforcement officer, including about eighteen to nineteen years of working on sexual-assault investigations of both adult and child victims, she did not testify to having any experience, education, or training in DNA analysis. While the record contains no explanation of what DNA or PSA are or the reliability of DNA analysis,[15] we fail to see any evidence that Black was qualified to testify about DNA based on her knowledge, skill, experience, training, or education on that topic. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also* TEX. R. EVID. 702.

---

[15]More than twenty-five years after the Texas Court of Criminal Appeals addressed the admissibility of DNA evidence, that field of study has come to be generally accepted in the scientific community. *Cf. Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *Ex parte Napper*, 322 S.W.3d 202, 216–23 (Tex. Crim. App. 2010). *Napper* addressed problems with one laboratory's performance of DNA testing. We cite it only to point out that, while the threshold for proper execution of DNA testing remains high, the use of such testing and its results, when done in strict accordance with the scientific standards at play, is generally accepted as a field appropriate for expert testimony.

With no hard formula to use, when we are called on to determine whether a proposed expert was properly qualified to testify on a particular topic, we should consider three factors: (1) the complexity of the field or topic, (2) the conclusiveness of the expert's opinion, and (3) the centrality of the area of expertise to the resolution of the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *see Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). Here, DNA analysis is quite complex, depends largely on expert testimony, and often can be case determinative. To be qualified, a proposed expert must go beyond just a general background in the field and must be shown to have knowledge, skill, experience, training, or education sufficient to address the specific issue before the court. *Vela*, 209 S.W.3d at 132. The focus is on the "fit" between the subject matter of the testimony and the expert's familiarity with that subject matter. *Id.* at 133. With no evidence of Black's qualifications specifically as to DNA analysis, it was error to allow her to give expert testimony about DNA analysis. *See id.* at 131–33.

Having found error, we review for harm. First, on balance at least, the DNA evidence in question tended to help Craver. Plus, the non-DNA evidence against Craver was substantial and compelling. The direct testimony from the victim, detailed above, was specific and graphic. The victim also differentiated for the jury between abuses by Craver and by McCartney.

Cassandra's testimony was corroborated by Halbrook, the forensic interviewer. Halbrook recounted in detail the acts constituting the offenses. Quinn, who treated Cassandra therapeutically for almost a year, testified that the young girl had been consistent in the core details of her allegations from her outcry through her therapy sessions. PSA and DNA evidence were not mentioned in the State's closing arguments. It is difficult to believe that a jury would have had

12

doubt of Craver's guilt without this DNA evidence, but could have been convinced to convict with it. *See Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978).

On the state of this evidence, we are confident that the error in allowing Black to testify to scientific testing results, where she was not qualified to do so, had no effect on Craver's substantial rights. *See* TEX. R. APP. P. 44.2(b). This point of error is overruled.

*(5)*    *Allowing Testimony Regarding the Percentage of Untruthful Allegations Among Child Sex-Abuse Victims Was Harmless*

Finally, Craver claims that the trial court erred in allowing testimony from Quinn. In answer to a question from the State, Quinn testified, "[T]here are several research articles that point to only about 2 to 8 percent of children lie about sexual abuse." While we find an abuse of discretion in admitting this testimony, we find that error harmless.

Quinn was a therapist and forensic interviewer at the local CAC. She had completed her master's degree in clinical health counseling and was interning at the CAC obtaining her clinical hours to be a fully certified, licensed professional counselor. Quinn testified that she had conducted about 330 forensic interviews and counseled about fifty persons. She was trained in specific therapeutic methods, such as play therapy and trauma-focused cognitive behavioral therapy. Quinn, in her capacity as a licensed professional counselor, had worked with and counseled Cassandra for almost a year in twenty-three sessions.

"Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful." *Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993). "An expert who testifies that a class of persons to which the victim belongs is

13

truthful is essentially telling the jury that they can believe the victim in the instant case as well." *Id.* at 711.

The Dallas Court of Appeals dealt with this issue in *Wilson v. State*, 90 S.W.3d 391 (Tex. App.—Dallas 2002, no pet.). There, an expert witness testified that she was "familiar with research concerning cases involving false allegations," most of which were custody or conservatorship cases. *Id.* at 393. The witness testified that research showed that two to eight percent of child allegations were false. *Id.* The Dallas Court of Appeals found error in admission of that testimony, because it "went beyond whether the child complainant's behavior fell within a common pattern and addressed whether children who claimed to be sexually assaulted lie. [That] testimony did not aid, but supplanted, the jury in its decision on whether the child complainant's testimony was credible." *Id.* In support, the court cited *Schutz v. State*, 957 S.W.2d 52, 70–71 (Tex. Crim. App. 1997). *Schutz* forbade admission of "evidence that a person's allegations are the result of manipulation or fantasy," finding that such evidence would not assist the jury, "because the jury is just as capable as the expert of drawing the conclusions involved." *Id.*[16]

We cited *Wilson* when we found several State witnesses "were asked to explain and then to comment directly on the factors they used in determining if th[e] child [complainant] was telling

---

[16]The Dallas Court of Appeals reiterated its position in *Wiseman v. State*, 394 S.W.3d 582, 587–88 (Tex. App.—Dallas 2012, pet. ref'd). *See also Barshaw v. State*, 320 S.W.3d 625, 629 (Tex. App.—Austin 2010), *reversed on other grounds*, 342 S.W.3d 91 (psychologist's testimony that "folks with mental retardation can be painfully honest" was inadmissible); *Lopez v. State*, 288 S.W.3d 148, 158–59 (Tex. App.—Corpus Christi 2009, pet. ref'd) (where doctor was asked whether teenage boys are truthful when they make a sexual abuse outcry, doctor's response that "[g]enerally, they tell the truth" was inadmissible); *Lane v. State*, 257 S.W.3d 22, 27 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("Dr. Thompson's testimony that false accusations of childhood sexual assault are very rare had the effect of telling the jury they could believe E.A.'s testimony, which is expressly forbidden."); *Aguilera v. State*, 75 S.W.3d 60, 64–66 (Tex. App.—San Antonio 2002, pet. ref'd) (psychologist's testimony that only 10 percent of children lie about sexual abuse was inadmissible).

the truth." *Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref'd).[17] In

*Edwards v. State*, 107 S.W.3d 107 (Tex. App.—Texarkana 2003, pet. ref'd), we found error where

multiple witnesses "were asked to comment directly on factors to determine if the child was telling

the truth" where the witnesses' "observations . . . [could] all be judged and determined by a jury

without the help of an expert." *Id*. at 116.[18]

Having found error in allowing this testimony from Quinn, we assess the record for harm.

We first refer to our analysis above highlighting the substantial evidence of Craver's guilt.

In its closing argument, the State argued credibility, but did not mention Quinn's testimony

about percentages. In its closing rebuttal, the State said that Halbrook could not "say [Cassandra]

was up here telling the truth because she can't testify to that, but [Cassandra] was consistent." The

State continued, "We all know what she was saying, she was telling the truth. She was telling

things that really happened." We read this to refer to Cassandra's testimony and her consistency

in describing the abuse at all relevant times and to all people to whom she reported.

The admission of Quinn's testimony did not affect Craver's substantial rights and hence is

to be disregarded. This point of error is overruled.

---

[17]In *Sessums*, we reversed the conviction for ineffective assistance of counsel, where "counsel's performance [was] constitutionally inadequate" because he failed to object to the improper testimony or to closing argument stressing that testimony. *Sessums*, 129 S.W.3d at 247–48.

[18]In *Edwards*, we did not conduct a harm analysis, but remanded to the trial court where one of the complained-of witnesses' testimony was admissible under the medical diagnosis exception to hearsay. *See Edwards*, 107 S.W.3d at 116–17; *see also* TEX. R. EVID. 803(4).

We affirm the trial court's judgment and sentences.


Josh R. Morriss, III
Chief Justice

Date Submitted:     December 4, 2019
Date Decided:      January 17, 2020

Do Not Publish