Scott Edward WISEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–10–01623–CR.

Court of Appeals of Texas, Dallas.

July 31, 2012.

Mick Mickelsen, Broden & Mickelsen, Dallas, for Appellant.

Patricia Poppoff Noble, Asst. Dist. Atty., Craig Watkins, Dallas, for Appellee.

Before Justices BRIDGES, FITZGERALD, and LANG.

## OPINION

Opinion By Justice FITZGERALD.

A jury found appellant Scott Edward Wiseman guilty of aggravated sexual assault of a child under the age of fourteen and assessed his punishment at twenty years' confinement. Appellant raises seven issues in this Court. He challenges four of the trial court's evidentiary rulings, the effectiveness of his counsel's representation, the State's comment on a witness's invocation of Fifth Amendment rights, and the cumulative effect of all these purported errors. We reverse the trial court's judgment and remand the case for further proceedings.

### BACKGROUND

The complainant in this case was thirteen years old at the time of the charged assault. She testified that, during the summer of 2005, after she completed the seventh grade, she was staying at home alone while her mother worked. Although it was against her mother's rules to have boys visit at the house, the complainant invited her boyfriend, I.R., to come to the house to see her. The complainant acknowledged that she invited I.R. so that they could have sex. I.R. arrived at the complainant's house with appellant, whom the boy introduced as his uncle. I.R. was fourteen at the time; appellant was forty-two. The complainant testified that over the course of two different weeks in July and August, she engaged in repeated sexual activity with both I.R. and appellant. The sexual conduct was both oral and vaginal, and the males penetrated her in turn and, on a number of occasions, simultaneously. The complainant initially resisted appellant's sexual advances, but she testified she eventually participated in the

sexual conduct with appellant because I.R. wanted her to do so, and she loved I.R.

The complainant subsequently learned that appellant was not I.R.'s uncle. Instead, appellant was allowing I.R. to live at his home with appellant's family. Appellant was married and his daughter, K.W., attended middle school with both the complainant and I.R. The complainant testified she knew that while she was dating I.R., he was also seeing K.W. And the complainant acknowledged that initially she did not like K.W. because I.R. ultimately "dumped" the complainant for K.W. The complainant further acknowledged that she grew to hate K.W. because she harassed the complainant regarding the charges against K.W.'s father.

Appellant testified in his own defense and denied having any sexual contact with the complainant. I.R. also testified at trial.[1] He testified that appellant had always treated him well, giving him money for clothes and buying food for I.R.'s family—including a birthday cake for I.R.'s mother—when I.R.'s father was out of work. I.R. called the complainant a liar and said that he and appellant had never gone to the complainant's home and had sex with her. The State impeached I.R. with his own statement taken during the investigation and with a telephone call made by the complainant and recorded by the police. The contents of those exhibits showed a sexual relationship among the two males and the complainant. I.R. testified he lied to the police in the statement because the officers threatened him, and he denied that he was the person speaking to the complainant on the recording.

Appellant's strategy at trial was to establish that the complainant lied about appellant's conduct in order to get back at K.W. for taking I.R. away from her. On appeal, the dispositive issue relates directly to that strategy.

## EXPERT TESTIMONY ON TRUTHFULNESS

In his first issue, appellant contends the trial court erred when it allowed the State's expert witness, Dr. Ashley Lind, to testify about the details of statistical studies to prove a minimal number of all child sexual abuse allegations are found to be false. Appellant argues this testimony was specifically prohibited by this Court's opinion—issued nearly a decade ago—in *Wilson v. State,* 90 S.W.3d 391 (Tex.App.-Dallas 2002, no pet.). We agree.

Lind's statistical opinion on the truthfulness of sexual abuse complainants was previewed at her rule 705 hearing. She testified in this manner:

[Q. by the Prosecutor] Statistically speaking, you've done—you've read research on child sexual abuse and, I guess, the rate of false allegations?

[A. by the Witness] Yes.

Q. And you've read and reviewed the research on that. What are the research statistics regarding that?

A. Approximately two percent of individuals who report sexual abuse are making false allegations.

Q. And of those two percent of individuals, what is that two percent made up of?

A. Out of the 2 percent, approximately 77 percent of those making false allegations are involved in a custody or divorce-related issue. The remainder have been coached by an adult person or have mental health issues.

Appellant objected to the testimony as improper expert opinion, based upon specula-

1. I.R. initially refused to testify. The State gave him use immunity, and the trial court ordered him to testify or risk being jailed for contempt.

tion. He further objected to the testimony on relevance grounds, citing rules 401, 402, and 403. The State argued that all of Lind's opinions, including the above-quoted statistics, should be admitted. The State did not cite to *Wilson* or to the primary case *Wilson* relied upon, *Yount v. State,* 872 S.W.2d 706, 712 (Tex.Crim.App. 1993).

The trial court made the following ruling:

> There are basically six opinions [Lind] wants to state. I'm going to let her go into each of the opinions except for the statistics on false allegations.

> And I know, before the State says it, I normally let this in, but it just seems to me in this case with these particular facts, it's more prejudicial than probative.

> So you cannot go into the false allegation statistics in this particular case, but that doesn't indicate that I'm going to rule this way on each and every case. Just this one.

On direct examination, Lind testified to a number of other opinions, but the State did not ask about her excluded opinion concerning statistics on false allegations. On cross-examination, the following exchange took place:

[Q. by Defense Counsel] Teenagers lie?

[A. by the Witness] Yes, I would say at times.

Q. Teenagers are manipulative?

A. That could be true.

Q. Teenagers are deceptive?

A. I wouldn't say these are characteristics as a norm, but yeah, everyone is capable.

Q. You remember what my question was?

A. Yes.

Q. Okay. So is the answer yes or no?

A. The answer is sometimes.

Q. Teenagers are vindictive?

A. Depending on their personality, anyone could be vindictive.

Q. Teenagers are vengeful?

A. Anyone is capable of any of these things.

Immediately after appellant passed the witness, a bench conference took place. Then, on re-direct, the following exchange took place:

[Q. by the Prosecutor] Dr. Lind, he asked you a list of questions about teenagers lying, being vindictive and being vengeful; right?

[A. by the Witness] Yes.

Q. And you were trying to explain to the jury. What were you trying to explain to them?

A. For the most part, any person is capable of engaging in any type of behavior. As a whole, teenagers don't tend to demonstrate those characteristics because they're a teenager. I wouldn't say that's true at all.

Q. And when it comes to a child lying about sexual assault allegations, have you done research—let me rephrase that. You have read the research and the studies out there about false allegations of sexual abuse with children?

A. Yes, I have.

Q. And what does the research say regarding that?

At this juncture, defense counsel re-urged his earlier objections and added objections that the testimony sought "would be a conclusion, hearsay, immaterial." The trial court overruled his objections. The testimony continued as follows:

A. The research says that it's not common.

Q. And he brought up a good point, but when we're talking about children, children is anybody under the age of 17; is that fair?

A. Yes.

Q. So the research says it's not common; is that correct?

A. That's right.

Q. And in a situation where it occurs, what does the research say regarding that? What percentage—

\* \* \*

A. The research says that approximately 2 percent of individuals make false allegations. Out of those 2 percent, approximately 77 percent of those individuals are involved in a custody or divorce-related issue.

\* \* \*

Q. After the 77—so 77 percent are custody battle between Mom and Dad and some allegations; right?

A. Yes.

Q. What's the rest of the percentage of that 2 percent?

A. The remaining percentage are individuals who have been coached by an adult person or who have a mental health issue.

Q. So an adult has told them what to say or they, themselves, have some mental health issue?

A. Correct.

Q. And that encompasses the 2 percent of false allegations of child sexual abuse?

A. Correct.

Q. And the research that you're speaking of, was this—do you know about that research? Can you tell us a little bit about that research?

A. There's quite a bit of research on false allegations.

Thus, Lind testified that seventy-seven percent of those individuals—i.e., seventy-seven percent of the two percent who make false allegations—are involved in custody or divorce-related issues; the remaining percentage have been coached by an adult or have a mental health issue. Lind went on to testify concerning three scientific studies:

● One study conducted by the Family Court System involved twelve states and 9,000 individuals. In that study, the authors found approximately two percent of the 9,000 individuals make false allegations or had made false allegations.

● A second study looked at CPS cases involving 1,200 individuals. This study also "replicated" approximately a two percent false-allegation ratio.

● A third study conducted in Colorado broke down the results by age group and again concluded that about two percent made false allegations. The single exception was very young children—three to four year olds—who had a higher rate.

In each of the studies, according to Lind, the two percent who made false allegations had the same issues: custody fights, mental health issues, and coercion.

The State's position at trial was that all of Lind's statistical evidence was admissible. After appellant briefly cross-examined Lind, the State asserted appellant had opened the door to the statistical evidence by asking whether teenagers lie, and the trial court agreed, overruling appellant's objections and denying appellant's suggested instruction.

 Texas law is settled that an expert cannot give an opinion as to whether a person—or a class of persons to which the complainant belongs—is truthful. *Yount,* 872 S.W.2d at 712. "An expert who testifies that a class of persons to which

the victim belongs is truthful is essentially telling the jury that they can believe the victim in the instant case as well." *Id.* at 711. This kind of testimony does not assist the jury as rule 702 contemplates. *Id.* Indeed, as we said in *Wilson,* such testimony "did not aid, but supplanted, the jury in its decision on whether the child complainant's testimony was credible." *Wilson,* 90 S.W.3d at 393. In *Wilson,* the State was permitted to offer testimony from Lind's predecessor, Cynthia Alexander, that only two to eight percent of children who complain of sexual abuse make false allegations.[2] Alexander testified further that the majority of those false allegations are made in custody cases. *Id.* On appeal, the State acknowledged that an expert cannot testify as to whether a person is telling the truth, but it contended the complained-of testimony related to whether the child complainant's behavior fell within a common pattern. *Id.* We rejected that argument and concluded the trial court erred by allowing Alexander to testify about what percentage of children lie about being sexually abused. *Id.* We reach the same conclusion today. The trial court erred when it allowed Lind to testify to the percentage of children who lie about being sexually abused. *See id.*

■ On appeal, the State acknowledges the holdings of *Yount* and *Wilson* but argues appellant opened the door to the inadmissible evidence by asking Lind whether teenagers lie.

■ Otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered "opens the door" to the evidence. *Schutz v. State,* 957 S.W.2d 52, 71 (Tex.Crim.App.1997). The party offering the evidence may not "stray beyond the scope of the invitation." *Id.*

We reject the State's argument that appellant opened the door to the statistical opinion on false allegations for several reasons. First, the State actually invokes *Yount* to say appellant sought Lind's opinion that a class of people to which the complainant belonged is untruthful. But appellant asked generally about teenagers, and prior to Lind's taking the stand three teenagers (the complainant, her best friend, and I.R.) had testified in the case. Because the teenage witnesses' testimony conflicted in a number of ways, the issue of their credibility was already squarely before the jury. There was no reason to believe the defense questions would inure solely to appellant's benefit: jurors could make their own judgments concerning which of the teenagers they found believable.

The State contends the jury could have inferred from the defense questioning that the complainant "had probably lied to manipulate the romantic situation she did not like," creating a false impression that needed to be corrected by Lind's statistical opinion on truthfulness. Lind's answers to appellant's questioning eliminated any possibility of a false impression. She repeatedly responded that while some teenagers might behave dishonestly, that is not something all teenagers do. Indeed, when questioned by the State and given the opportunity to clarify her responses, Lind stated:

[A]ny person is capable of engaging in any type of behavior. As a whole, teenagers don't tend to demonstrate those characteristics because they're a teenager. I wouldn't say that's true at all.

---

2. We note the evolution of the expert testimony since 2002. In *Wilson,* Alexander testified to a range between two and eight percent; Lind now testifies only to the bottom number in that range. Appellant contends Lind is misrepresenting the data from the same research. We need not adopt that position to reach our conclusion in this case.

Lind testified, and then repeated, that although any person is capable of lying, it is not true that teenagers are simply not to be believed. Lind did not—at this point in the trial—express an opinion concerning the truthfulness of any group. Thus, no statistical opinion concerning the group needed to be given to "correct" any false impression. At this point, before Lind proceeded to testify about statistical data, the record reflects nothing other than Lind's expert opinion that it cannot be said that all teenagers lie.

This case centers on a credibility determination. The complainant testified appellant engaged in certain conduct; appellant denied the conduct; and the alleged witness (I.R.) first admitted, but then denied, that appellant engaged in the conduct. Nearly every question of every witness at trial had implications for the jury's determination of the credibility of the complainant and appellant. This is not an unusual circumstance in a sexual abuse case, where "a successful conviction often depends primarily on whether the jury believes the complainant, turning the trial into a swearing match between the complainant and defendant." *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex.Crim.App.2002). We decline the State's invitation to speculate on what "inference" the jury may have drawn from appellant's questioning. We can fairly conclude that the testimony elicited from Lind as a result of these few inquiries was obviously detrimental, not beneficial, to appellant. We certainly cannot conclude that the exchange, by any interpretation, created a false impression. Instead, this exchange likened the characteristics inquired about to society in general and not solely to teenagers.

Even if we assume the few questions of Lind could have suggested teenagers were less than truthful, the State may not stray beyond the scope of that "invitation." *See*

*Schutz,* 957 S.W.2d at 71. Here, Lind's testimony fully supported the State's position throughout the trial: on direct, cross-examination, and redirect. And on redirect, the State revisited the issue and clearly developed what it wanted to show, i.e., that teens do not lie as a matter of course. The State went far afield in showing that few, if any, children under the age of seventeen lie about sexual abuse. In so doing, the State cast the complainant as the truth teller. It substituted the expert witness for the jury, whose responsibility it was to assess the credibility of witnesses. We cannot say that the general questions concerning credibility propounded in this case opened the door to specific expert opinions that have the effect of taking the credibility issue away from the jury. *See Yount,* 872 S.W.2d at 712; *Wilson,* 90 S.W.3d at 393. We conclude the defense did not open the door to the expert's statistical opinion on false allegations in this case.

■ We have concluded that admitting the statistical opinion on false allegations was error. We also conclude the admission of the opinion likely affected appellant's substantial rights. *See Wilson,* 90 S.W.3d at 393 (error is non-constitutional); *see also* Tex.R.App. P. 44.2(b). In this case, the State offered no independent evidence of the offense; its case turned solely on the credibility of the complainant and those to whom she outcried. *Cf. Wilson,* 90 S.W.3d at 394 (medical records of complainant's pregnancy and defendant's flight provided independent support for complainant's testimony). Moreover, the State emphasized the impact of the testimony when it argued in closing:

> Dr. Lind told you that only two percent of these cases are false and, frankly, they're kids who are in custody battles. This child wasn't in a custody battle.

Our review of the record establishes that the State offered and emphasized expert testimony that the complainant was telling the truth and—by necessary implication—that appellant and I.R. were not telling the truth. We conclude the error likely affected appellant's substantial rights.

We sustain appellant's first issue.

### Conclusion

The trial court erred in admitting expert testimony concerning the truthfulness of a class of persons to which the complainant belongs, i.e., children alleging sexual abuse. Given our resolution of this first issue, we need not address the remainder of appellant's issues. We reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.