NO. PD-0232-15

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

ROBERT ANTHONY CANTU

Petitioner,

vs.

THE STATE OF TEXAS

Petition for Review of the
Eighth Court of Appeals
Judgment in No. 08-12-00348-CR
affirming conviction in Cause No. 20090D05872
from the 243rd Judicial District Court
El Paso County, Texas

**PETITION FOR DISCRETIONARY REVIEW**

Charles L. Roberts
Attorney for Petitioner
Texas Bar No. 17100100
300 E. Main Dr., Suite 640
El Paso, Texas 79901
915-532-5475
915-534-7417 fax
clrlawyer@yahoo.com

SUBMITTED: April 01, 2015

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................iii

STATEMENT REGARDING ORAL ARGUMENT............................................iv

STATEMENT OF THE CASE..........................................................v

PROCEDURAL HISTORY...............................................................vi

GROUNDS FOR REVIEW .................................................................1

ARGUMENT

    1.  Whether the Court of Appeals was mistaken in its holding that the testimony of two Police Officers that the Complaining Witness was credible or that they believed her was harmless…………………………2

PRAYER FOR RELIEF.....................................................................20

CERTIFICATE OF SERVICE ............................................................21

CERTIFICATE OF COMPLIANCE ..................................................21

APPENDIX A Opinion …...................................................................... 22

# INDEX OF AUTHORITIES

## CASES

*Arzaga v. State*, 86 S.W. 3d 767 (Tex.App. – El Paso 2002, no pet.)……..…12, 13

*Cantu v. State,* No.'s 08-12-003488-CR  2015 WL 40054 (Tex.App.-El Paso Jan. 30, 2015)......................................................................................14, 15, 16, 18

*Barshaw v. State,* 342 S.W.3d 91 (Tex.Crim.App. 2011) ...........................12, 16, 17

*Brookins v. State*, No. 08-10-00242-CR, 2011 WL 6357786 (Tex.App. –El Paso Dec. 14, 2011, pet. ref'd)………………………………………………...……12, 13

*Rhodes v. State,* 308 S.W.3d 6 (Tex.App. - Eastland 2009, pet. dism'd)…………………………….…………………………...…..12, 14, 15

*Schutz v.* State, 63 S.W.3d 442 (Tex.Crim.App. 2001)..…………………………………………….…..…..12, 14, 15, 16, 17

## CONSTITUTIONS AND STATUTES

TEX. R. APP. P., Rule 66.3(f)..............................................................................19

# STATEMENT REGARDING ORAL ARGUMENT

Because these errors are of a nature that all but guarantee their repetition and a need for an exercise of this supervisory authority of this Court, Counsel believes that oral argument would be helpful.

# STATEMENT OF THE CASE

This is an Appeal of a criminal conviction and sentence. Robert Cantu, Petitioner herein, was charged by indictment with two counts of Sexual Assault, (CR I 3-4). A jury found the Petitioner not guilty as to count I and guilty as to count II, (CR I 205, 198). The Appellant was sentenced to 2 years confinement, (RR V 12 ET SEQ.).

A Motion for New Trial was timely filed, (CR I 158), but was overruled by the Court, on November 14, 2012, (CR I 316).

## PROCEDURAL HISTORY

The Eighth District Court of Appeals sitting in El Paso affirmed the Petitioner's conviction and sentence on January 30, 2015, *Cantu v. State* No. 08-12-00348-CR, 2015 WL 40054 (Tex.App.-El Paso Jan. 30, 2015).

No Rehearing was filed. This Petition is being timely filed pursuant to an Motion for Extension of Time Granted by this Court.

# GROUNDS FOR REVIEW

1. Whether the Court of Appeals was mistaken in its holding that the testimony of two Police Officers that the Complaining Witness was credible or that they believed her was harmless.

# ARGUMENT

## I. WHETHER THE COURT OF APPEALS WAS MISTAKEN IN ITS HOLDING THAT THE TESTIMONY OF TWO POLICE OFFICERS THAT THE COMPLAINING WITNESS WAS CREDIBLE OR THAT THEY BELIEVED HER WAS HARMLESS

### 1. The First Jury Trial

Robert Cantu, Petitioner herein, was charged with two counts of sexual assault, the first count alleging that Petitioner caused the sexual organ of "Amanda" to contact the mouth of Petitioner (CR I 3); and the second count alleging that Petitioner digitally penetrated the sexual organ of Amanda Magni, (CR I 4), both events allegedly occurring on March 8, 2009, (CR I 3-4). Initially, Petitioner went to trial on or about May 9, 2011. The jury in that case informed the Court that they were deadlocked, (CR I 98). Thereupon, the trial Court "Allen Charged" them, (CR I 100). Whereupon the jury sent out a further note that the jury was deadlocked, (CR I 99). A Mistrial was declared by the Court.

### 2. Testimony of the Complaining Witness at the Second Trial

The Alleged victim, "Amanda", testified that she was a family friend of Robert Cantu's family and that she would often spend the weekends at the Cantu's, (RR III 29-30). "Amanda" testified that she was fourteen years of age, (RR III 27).

2

"Amanda" testified that she was dropped off at the Cantu house by her father on March, 2009 (RR III 31). According to "Amanda," the Petitioner, Robert Cantu, his wife Crystal Cantu, and their sons Steve and Justin were there, (RR III 30, 32.). "Amanda" testified that she, Steve, an individual named Kyle, and the Petitioner were in the living room watching T.V. and then were all sleeping in the living room, (RR III 32-37). "Amanda" testified that she woke up when Petitioner had "placed his mouth on … my privates," (RR III 37). According to "Amanda," The Petitioner left the room and she "turned over and tried to fall back asleep," (RR III 40). "Amanda" then testified that Petitioner came back when she was between awake and being asleep, and put his finger between her labia, (RR III 41-42). Following this "Amanda" testified that she did not know where Petitioner went, but she got up, went to the bathroom, and washed herself, (RR III 43). "Amanda" asserted that after that she went to the bathroom of Justin, another member of the Cantu family, (RR III 44-45). "Amanda" further related that she conversed with Justin as to whether she needed a blanket, (RR III 45). "Amanda" then related that she decided to leave the residence to make a 911 call, (RR III 44, 45-46). According to "Amanda" she decided to leave the house not through the front door or the other exits to the house, but through the "doggy door" in the back plate glass sliding door apparently right next to where Appellant was sleeping with his son

3

Steven, (RR III 46-48, State's Exhibit #4). Then "Amanda" testified that she crawled out of the doggy door, go out to the backyard, and "jumped over the rock wall," (RR III 49-50). "Amanda" the related that:

> Q. Okay. And do you injure yourself at all when you did that?
> A. Um, just a couple of scrapes.
> Q. What happened when you got over the wall?
> A. I called the police.
>
> **(RR III 50)**

"Amanda" was cross-examined as to the chronology of the events, (RR III 75, 77-78, 79-80, 81-82, 83, 94-97, 103-104), and "Amanda" was cross-examined as to why she did not call home or 911 in the residence and as to whom she actually called:

> Q. Okay. And okay did you call anybody else before you talked to the police?
> A. I tried – I don't – I know when I was in the cop car that I tried calling my friend Sam, but I don't know if I tried calling him when I was in Justin's room. But that's the only person I tried to contact, he didn't answer.
>
> ***
>
> Q. Okay. Let's go back to Justin's room, okay. And Sam was – what would you consider at that time a close friend?
> A. Yes.
> Q. More than an acquaintance?
> A. Yes.
> Q. More than somebody you just met? Did you have any other close friends?
> A. Um, not really.

4

Q. Really?

A. Not that I can think of at this time.

**(RR III 108-109)**

And:

Q. Well, let me put it this way. Did they ever ask you if you notified anybody else after the incident?

A. I don't remember.

Q. Okay. Do you recall telling them in answer to that question that you were attempting to call your friend Violet Petta?

A. No I did not.

Q. Hum?

A. That did not happen.

Q. Okay. But that Violet Petta wouldn't answer the phone?

A. I didn't even have her number.

**(RR III 128)**

## 3. The Testimony of responding Officer (later promoted to Detective) Alvarez

On direct examination, Officer Alvarez basically related what he observed at the scene, including the Petitioner's denial that he had committed these offenses, RR III 173. On cross-examination, the Officer testified:

Q. Officer, do you recall asking whether she had notified anybody else of this incident?

A. Yes, I recall.

Q. Do you recall her saying that she had called Violet Petta?

5

A.  Yes, she told me that.

**(RR III 188)**

During and after direct examination, and again after cross-examination, the State continually stated to the Trial Court that precedent required that the Trial Court admit evidence that the Officer found the Complaining Witness credible and/or that he believed her, (RR III 190-191):

The Court:  All Right.  Based on the authority that the State has supplied to me, I'm going to reverse my earlier ruling on the evidentiary that we discussed outside the presence of jury.

Mr. Roberts:  Your Honor, I'm still making objection to relevance, in that its prejudicial impact exceed its probative value, and also that it's improper bolster.

The Court:  I appreciate that, and the objections are overruled.

Mr. Williams:  Thank you, Your Honor.

By Mr. Williams:

Q.  Detective Alvarez, after interviewing the complaining witness, did you find her credible?

A.  Yes, I did.

**(RR III 190-191)**

### 4.  The Testimony of Nurse Kathy Justice

Nurse Justice testified that she had been a nurse for some 18 years with a specialty of sexual assault exams, a sexual assault nurse examiner, RR III 192). She described the medical history she had taken from the complaining witness,

"Amanda," which differed in many respects from her testimony at trial, compare: (RR III 198-200) with (RR III 43-47). Nurse Justice testified as to the injuries she noted:

> Q. Okay. Let's turn to the page where we have a diagram, where you make notations about the injuries you observed?
>
> A. Okay.
>
> Q. Tell us what those are, please?
>
> A. Yes. There's a small four-and-a-half-by-one centimeter abrasion on the inside of the left wrist. There's a small one-by-two centimeter abrasion on the back of the right calf.
>
> Q. Then on the next page?
>
> A. Yes.
>
> Q. Did you note any injuries to her vagina?
>
> A. I did not.
>
> Q. Did she complain of any?
>
> A. No.
>
> **(RR III 200)**

And on cross, Nurse Justice testified that she relied on the story told to her by "Amanda":

> Q. Okay. And you say that you made the finding that this was sexual assault per the history, right.
>
> A. Yes, that's the diagnosis that we use, because the patient has told you that.
>
> Q. Yeah. You didn't find any physical evidence showing that?
>
> A. No, sir, I didn't.
>
> **(RR III 203-204)**

**5.** <u>**The testimony of Christine Ceniceros**</u>

Christine Ceniceros testified that she was a DNA Analyst for the Texas Department of Public Safety, (RR III 204-205). Ms. Ceniceros testified that she examined a known blood ample for "Amanda" and a "debris swab from her external genital area," (RR III 209), with the following result:

Q. But in this case you found no extraneous DNA at all, right?
A. That's correct.
**(RR III 211)**

**6.** <u>**The Testimony of Detective Nevarez**</u>

E.P.P.D. Detective Yvette Nevarez testified that she was assigned to the Robert Cantu case, (RR III 243); and in that role on interviewed Amanda Magni one time on April of 2009, (RR III 243-244). At the close of the State's direct examination of Detective Nevarez, the State again went into the subject of truthfulness of Amanda Magni, with the Detective testifying over objection that she found Amanda Magni to be "truthful", and "credible," and that the Detective believed her, (RR III 244-245).

**7.** <u>**The Testimony of Natalia Magni**</u>

The State represented extraneous offense evidence over objection from "Amanda's" Sister, Natalia Magni, who testified that she fell asleep on the couch

8

and woke up with the Petitioner also asleep on the couch, "near her feet," and leaning against her legs, (RR III 251-263). Ms. Magni testified that "nothing happened to me personally with him touching me, like inappropriately." (RR III 261). Because Ms. Magni was unavailable to testify later in the Trial, the Defense and State stipulated that she would testify that following this incident, she still spent the night over at the Cantu residence once or twice afterwards, (RR III 255-256).

## 8. "911" call

Over objection, a "911" call made by "Amanda" on March 8, 2009, was played to the jury, (RR IV 10-11, 14).

## 9. The Close of The States Case and the Defense Case

At the end of the State's case, (RR IV 14), Defense Counsel renewed his objections to the credibility/believability evidence from the police officers:

Mr. Roberts: Yes, Your Honor. At this time we'll renew all of the objections and request for instructions that we made during the State's case, especially --

The Court: All right. So --

Mr. Roberts: -- especially -- I just want to give one little argument.

The Court: Sorry to interrupt you.

9

Mr. Roberts: -- especially the evidence regarding the police officer's testifying as to the credibility of the complaining witnesses in this case.

I believe that this not only is irrelevant, highly prejudicial, and improper bolstering, but it also invades the province of the jury as far as determining the credibility of witnesses, and I would ask this Court to suppress.

The Court: All right. So your request for me to reconsider your prior rulings --

Mr. Roberts: On those basis.

The Court: -- that is noted and denied.

**(RR IV 14-15)**

The Defense called no witnesses, and Simply rested, (RR IV 16).

## 10. Final Argument

In its opening portion of Final Argument, The State argued "… you've heard two detectives that testified about "Amanda's" credibility." (RR IV 41). In its closing portion of Final Argument, the State argued:

You also got to hear from Detective Alvarez, Crimes Against Children detective. He said yes, I talked to her at the time I got a chance to look at her she seemed credible. Detective Nevarez, I got chance to look at her at the time, I believed her.

**(RR IV 72-73)**

## 11. Jury Deliberation

During deliberations, the jury sent out a request for the reports of the "responding officer" and the "child advocate officer," (CR I 196). Four hours

10

later, the jury sent out a note that they were "deadlocked," (CR I 197). The next day, the jury reached a mixed verdict, not guilty as to count one, guilty as to count two, (CR I 205, 198).

## 12. <u>Post-Conviction</u>

Following trial, Defense Counsel filed an extensive <u>Motion for New Trial</u> based on the legal error of admitting the credibility/believability of Officer Alvarez and Detective Nevarez supported by numerous authorities, (CR I 212). After a hearing, this Motion was denied by the District Judge of the 243rd District Court, (CR I 316), finding that the Trial Court's ruling was within its discretion.

## 13. <u>The Appeal</u>

Disregarding the Arguments and Authorities previously submitted to the Trial Court at Trial and the Argument and Authorities to the District Court in opposition to the <u>Motion for New Trial</u> (RR III 189: CR I 258) the State freely confessed error in its <u>Appellee's Brief</u>, at pp. 12-14, "The officers' testimony appears to fall squarely within the prohibited category of evidence. This, for the reasons above, the State does not contest that the Trial Court erred when it allowed the complained-of testimony", but then (for the first time) claimed that such error was harmless. The Court of Appeals accepted this argument basing its decision on a string of cases, <u>*Arzaga v. State*</u>, 86 S.W.3d 767, 776 (Tex.App. – El Paso 2002,

no pet.); *see Brookins v. State*, No. 08-10-00242-CR, 2011 WL 6357786, at *2 (Tex.App. – El Paso Dec. 14, 2011, pet. ref'd); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011); *See Rhodes v. State*, 308 S.W.3d 6, 11 (Tex.App. – Eastland 2009, pet. dism'd); *Schutz v. State*, 63 S.W.3d 442, 446 (Tex.Crim.App. 2001), of course, the most prominent of these cases was this Court's decision in *Schutz*. The Petitioner argues that the Court of Appeals misapplied *Schutz* (and its own precedents) in its decision that the error was harmless.

## 14. **The Decision of the Court of Appeals**

First of all, the Court of Appeals fails to consider the whole record as required in *Schutz*. For example, the Court of Appeals failed to consider the following: (1) that there were *two* improper witnesses as to the credibility of the Complaining Witness; (2) that the State at Trial argued that because of the cross-examination of "Amanda" by Defense Counsel, that they wanted credibility evidence so that she could be "rehabilitated"; (3) that the Defense had gotten Officer Alvarez to expressly contradict "Amanda's" testimony that she did not call a Violete Petta after the assault and had never told the Officer that that had happened, compare RR III 128 and RR III 188, (this point was ameliorated by the improper evidence from Alvarez that he still believed her to be credible); (4) that the State repeatedly told the Trial Court that case law supported this evidence after

12

the Trial Court initially gave a correct ruling, (RR III 185); (5) that the State argued in the Motion for New Trial that the decision to admit such evidence was in the discretion of the Court; (6) that the State argued it *twice* in Argument, both in Opening and Closing; and (7) that there was no significant other evidence upon which the Jury could have made a credibility decision apart from the admittedly inadmissible evidence. Indeed, the cases of the Court of Appeals cited by the Court, all contained significant other evidence upon which the jury could have relied. For example, in *Arzaga*, there were actual physical evidence, photographs showing the injury to the victim, *Arzaga*, 86 S.W. 3d at 777. And, "the State made no mention of the evidence in its closing," *Arzaga*, at 777. In *Brookins*, the physical evidence was unbelievable in extent:

> After interviewing J.P., Burzynski obtained Brookins' consent to search his office and his residence, which was located in an employee housing area adjacent to the WTSS campus. Burzynski indicated that he was looking for items that J.P. had described during his interview, such as a penis pump, a small DVD player, artificial vaginas, and pornographic DVDs, including one made by the production company "Mandingo." He found all of these items in Brookins' residence. Burzynski found Avon lotions and petroleum jelly--additional items he was looking for--in Brookins' office.
>
> Burzynski also arranged for crime lab technicians to test the seized items, as well as Brookins' office, for the presence of semen. DNA testing revealed Brookins' and J.P.'s semen in areas of the office and J.P.'s semen inside one of the artificial vaginas.
>
> **Brookins v. State**, No. 08-10-00242-CR at P.6 (Tex. App.-El Paso Dec. 14, 2011)

13

The Court of Appeals "nit-picked" factors from this Court's decisions in

*Shutz* and *Rhodes* without considering these same factors in light of whole record.

> By comparison, the statements of Detective Alvarez and Detective Nevarez were short and to the point, and made without elaboration.7 *See Rhodes*, 308 S.W.3d at 11 (where the court found the error harmless in part because the witness answered only two questions affirmatively and without elaboration).
>
> **Cantu v. State**, No. 08-12-00348-CR, 2015 WL 40054 at p. *3 (Tex.App.-El Paso Jan. 30, 2015)

This Court in Rhodes fount that the evidence complained of was proper

character evidence (reputation) arguably wrongfully admitted and observed that:

> Cox's testimony was brief, constituting less than three pages of the record. The majority of that testimony consisted of Cox identifying himself and explaining how he knew R.K. Of relevance to this appeal are only two questions. Cox was asked if he was familiar with R.K.'s reputation for veracity and if that reputation was good. He answered both questions affirmatively without elaboration.
>
> **Rhodes v. State**, 308 S.W.3d 6, 11 (Tex.App. 2010)

First of all, our Trial Record was incredibly short for such a case, with testimony

comprising less than 250 pages in total, (one volume). The responding E.P.P.D.

Officer Detective Alvarez' testimony totaled 18 pages and Detective Nevarez'

testimony totaled 9 pages and the State established that both Alvarez and Nevarez

were veteran police officers, trained to investigate child sex cases, experienced in

14

investigating child sex cases, See Officer Alvarez, (RR III 163-164, 186-187); and See Detective Nevarez, (RR III 241-243). This is not the 3 page "Cox" testimony in _Rhodes_. And even more telling is the Court of Appeals ignoring the salient portion of the _Rhodes_ holding that this character evidence was harmless.

> R.K.'s mother and brother confirmed that Rhodes confessed and apologized when confronted with R.K.'s allegation and that he then left the house. R.K.'s mother testified that Rhodes was scared and shaking after the confrontation and that he begged her not to call the police.
>
> **Rhodes v. State**, 308 S.W.3d 6, 11 (Tex.App. 2010)

Thus, in _Rhodes_ there was significant other evidence that the Jury could have used to make their decision.

Similarly, the Court of Appeals "nit-picked" the _Schutz_ case to note the mixed verdict in our case as being determinative:

> Consequently, "[g]iven the significance of the acquittal, the record does not support a finding that the jury allowed the expert testimony [as to the complainant's truthfulness] to supplant its own decision." _Id_. Likewise in the present case, the jury's acquittal on the contact count demonstrated that the erroneously-admitted testimony did not supplant its own decision regarding A.M.'s credibility.
>
> **Cantu v. State**, No. 08-12-00348-CR, 2012 WL 400454 at p.*4 (Tex.App.-El Paso Jan. 30, 2015)

The Court of Appeals emphasized this point without considering the entire record. Count one was the oral-vaginal sexual assault that allegedly occurred before

15

"Amanda" went back to sleep to be awoken later with another sexual assault of digital penetration (Count II), (RR III 40, 41-43). The jury could have found that Count one was unbelievable, if not impossible, for a 14 year old to be sexually assaulted in the alleged perpetrator's home and go right back to sleep. The Jury could have completely ignored this Count, and gone immediately to Count Two, digital penetration, because the complaining witness testified that the second sexual assault finally got her attention and woke her up, (RR III 41-43). Focusing on Count Two, the Jury could have reasoned that in as much as this second assault was possible, they could use the officer's experienced belief in "Amanda's" story to judge if this Count was credible. And, it seems that the Court of Appeals seems to interpret *Schutz* as holding that if the expert's opinions as to credibility do not "supplant" the Jury's determination, that such evidence was harmless. Surely, there must be an area of significant or substantial effect on a jury between the term "supplant" and the term "influenced the jury only slightly." *Cantu* at p. 3, citing *Barshaw*. And again, in *Barshaw* there was significant other evidence upon which the jury could have based its credibility choice, including:

> K.B. testified that appellant touched her "pelvis," and Kleypas testified that she found an abrasion to the posterior fourchette, approximately 1.75 centimeters long and 1 centimeter wide, that could have resulted only from penetration. The results of the exam, Kleypas testified, were consistent with the events K.B. had described. [foot notes omitted]

16

* * *

These contradictions from appellant's own testimony, when viewed in the context of the record as a whole, provide a basis for a jury to question appellant's credibility even without considering K.B.'s testimony.

**Barshaw v. State**, 342 S.W.3d 91, 95, 96 (Tex.Crim.App. 2011)

Finally in *Shutz v. State* itself, this Court observed that the jury could have relied on significant other evidence relating to the credibility of the Complaining Witness including "testimony from the victim's mother that the victim was a truthful person," and "expert testimony concerning the physical injuries suffered by the victim that were consistent with purposeful penetration …," *Schutz*, 63 S.W. 22 at 446. Indeed, in every case citied by the Court of Appeals there is significant other evidence that the jury could have relied upon.

### 15. <u>Reason for Granting Petition for Discretionary Review</u>

In every case cited by the Court of Appeals and every case not cited examined by Counsel where harmless error was found, there was significant other evidence upon which the jury could have made a credibility decision. In our case, there is no such evidence. This is clear departure from earlier precedents.

It is also important to note the Court of Appeals hung its hat on the general instruction as to credibility of witnesses:

17

Although the prosecutor's reference may have arguably had some tendency to reinforce the improper testimony, the jury was properly instructed that it was the exclusive judge of witness credibility. *See Barshaw*, 342 S.W.3d at 96 (noting the jury was instructed that it was the sole judge of the witnesses' credibility); *Brookins*, 2011 WL 6357786, at *3.

> **Cantu v. State**, No. 08-12-00348-CR, 2015 WL 400454 at p. *4 (Tex.App.-El Paso Jan. 30, 2015)

Query, if the Jury believed that the officers were credible witnesses (which in all other respects they were), could a jury have believed that the officer's testimony was admitted to help them make a difficult credibility decision? Juries are instructed that they should consider all of the evidence admitted at Trial, and if we do not wish them to utilize other witnesses in making the tough credibility questions in child sex cases, then the proper remedy is to exclude these witnesses, not to pretend that a jury instruction excludes consideration of evidence actually admitted before them at Trial.

If we are not going to exclude such evidence, Counsel supposes that the Defense can hire an expert or experts to observe the complaining witness on the stand and to testify whether they believed the Complaining Witness or not, as to whether the Complaining Witness was credible or not. And since we are going to allow (or excuse) human polygraphs, we might reconsider equally unreliable electrical polygraphs a well. Because this error will likely be repeated in the future

18

as often as it had in the past, this case requires an exercise of this Court's supervisory powers, for the reasons stated above.   The Texas Rules of Appellate Procedure, Rule 66.3(f) lists the following as a consideration in deciding whether to grant discretionary review:

> whether a court of appeals has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by a lower court, as to call for an exercise of the Court of Criminal Appeals' power of supervision.
>                                                  **T.R.APP.P.,** Rule 66.3 (f)

The Petitioner respectfully suggests that this case begs the Court to exercise its supervisory powers.

## PRAYER FOR RELIEF

The Petitioner respectfully suggest that this Court reverse and remand this cause for a New Trial, or in the alternative, that this Court remand this cause to the Court of Appeals for further consideration of the specific harms asserted by the Petitioner.

Respectfully submitted,

/s/ Charles L. Roberts /s/
Charles L. Roberts
Attorney for Petitioner
Texas Bar No. 17100100
300 e. Main Dr., Ste 640
El Paso, Texas 79901
915 - 532-5475
915- 534-7417 fax

## CERTIFICATE OF SERVICE

I certify that a copy of this petition was mailed to the Office of the El Paso County District Attorney, 2nd Floor, El Paso, Texas, 79901, and mailed to the State Prosecuting Attorney at P.O. Box 12405, Austin, Texas, 78711 on April 01, 2015.

/s/ Charles L. Roberts /s/
Charles L. Roberts

## CERTIFICATE OF COMPLIANCE

I certify that Appellant's Petition for Discretionary Review contains 4,217 words and complies with the applicable Rules of Appellate Procedure.

*Is/* Charles L. Roberts /s/
Charles L. Roberts

# NO. PD-0232-15

# IN THE

# COURT OF CRIMINAL APPEALS

## AUSTIN, TEXAS

---

## ROBERT ANTHONY CANTU

## Petitioner,

## vs.

## THE STATE OF TEXAS

---

Petition for Review of the
Eighth Court of Appeals
Judgment in No. 08-12-00348-CR
affirming conviction in Cause No. 20090D05872
from the 243rd Judicial District Court
El Paso County, Texas

---

## APPENDIX 1
(Eighth Court of Appeal's Opinion)

---



ROBERT ANTHONY CANTU,

§

Appellant,

§

v.

§

THE STATE OF TEXAS,

§

Appellee.

§

§

No. 08-12-00348-CR

Appeal from the

243rd District Court

of El Paso County, Texas

(TC# 20090D05872)

## **O P I N I O N**

Appellant Robert Anthony Cantu appeals his conviction for sexual assault of a child. The jury found Appellant guilty of sexually assaulting A.M. by penetrating her sexual organ with his finger, but not guilty of sexually assaulting A.M. by causing her sexual organ to contact his mouth. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A, C). The trial court assessed punishment at two years' confinement.

As in many sexual assault cases, the child, A.M., was the only witness to the crime to testify. Appellant attacked A.M's credibility at trial, arguing she was delusional or simply fabricating the assault for some unknown reason. The trial court allowed the State to buttress its case by allowing two police detectives to testify A.M. was credible. The State concedes this was error, but argues the error was harmless. After conducting a full harm analysis of the entire

record, we agree the error was harmless and affirm the conviction.

## FACTUAL BACKGROUND

A.M.'s father and Appellant Robert Cantu were close friends. On the evening of March 8, 2009, A.M. spent the night at the Cantu residence.[1] A.M. fell asleep on the couch while watching television in the living room. A.M. testified that sometime after 3 a.m., she awoke to find Appellant with his mouth on her vagina. When A.M. asked what he was doing, Appellant stopped and left the room without responding. A.M. testified that although she felt weird, dirty, confused, and scared, she turned over and fell back asleep. Later, A.M. awoke to find Appellant with his hand down the front of her pants and his fingers inside her labia. When A.M. told Appellant to stop, he replied that "he had already been down there," that he loved her, and that she should give him a goodnight kiss.[2] A.M. told Appellant to "just go to bed," and Appellant left and went into the kitchen.

A.M. went to the bathroom and washed herself because she felt "gross." A.M. started to make an emergency 911 call, but when her cell phone beeped loudly, she did not complete the call, fearing Appellant would hear her calling for help. A.M., wearing only her sleeping clothes and socks, then left the house by going through the dog door backwards, so she could watch Appellant, who was asleep, and because it was quieter than using the other doors. A.M. climbed over the backyard rock wall, injuring herself in the process, and walked through the desert to the street and called 911.[3]

---

[1] A.M. was 14 years' old at the time.

[2] A.M.'s sister testified about a prior incident when she spent the night at the Cantu residence in 2007 and awoke to find Appellant lying on top of her with his head on her lap. When she retreated to a bedroom, Appellant followed, telling her "I love you[.]"

[3] A redacted version of the 911 audio recording was played for the jury who heard A.M. telling the operator that she woke up to find Appellant's hand in her privates.

2

Detective Alejandro Alvarez was dispatched to the scene. He found A.M. on the sidewalk at the corner. He observed that A.M. was not wearing any shoes and was also without a jacket on a cold morning. A.M. asked the officers to move their vehicle away from the residence because she did not want Appellant to see her talking with them. A.M. related what had happened to Detective Alvarez. Over objection, Detective Alvarez testified that he found A.M. credible.

After interviewing A.M., Alvarez went to the Cantu residence and spoke to Appellant, informing him of the allegations, which Appellant denied. He observed that Appellant did not appear surprised that A.M. was not in the house. After conducting his investigation, Alvarez took A.M. to the hospital for a rape exam. The examination and the subsequent lab testing did not disclose any physical evidence such as injuries to A.M.'s vagina or the presence of foreign DNA.[4]

Detective Nevarez with the Crimes Against Children Unit interviewed A.M. about one month after the sexual assault. During the interview, A.M. told Detective Nevarez what had happened. Over objection, Detective Nevarez testified that she thought A.M. was telling the truth and that she found A.M. to be credible.

## THE STATE CONCEDES ERROR

In four related issues, Appellant complains the trial court abused its discretion in admitting the following testimony of Detective Alvarez and Detective Nevarez that A.M was truthful and credible:

[Detective Alvarez]

---

[4] The sexual-assault nurse examiner observed small abrasions on A.M.'s wrist and calf and a bruise on A.M.'s leg, but did not observe any injuries to A.M.'s vagina. A.M.'s genital area was swabbed for dried saliva to collect DNA, but the nurse testified that she would not expect to find DNA evidence because A.M. had washed herself. Subsequent testing did not disclose any semen and found only A.M.'s DNA in the samples. The analyst testified that she would not expect to find another person's DNA in a sample where the victim had washed herself, urinated, and cleaned up the area where the DNA was collected.

Q:  After interviewing [A.M.], the victim, noticing her demeanor, how she was acting, talking to the defendant, his family and her and her family, did you believe the victim?

…[objection and intervening argument]

Q:  Detective Alvarez, after interviewing the complaining witness, did you find her credible?

A:  Yes, I did.

[Detective Nevarez]

Q:  Okay.  You had an opportunity to sit down with [A.M.], observe her demeanor, did you think she was telling the truth?

A:  Yes.

…[objection]

The Witness:  Yes, I did.  I found her to be credible.

Appellant argues this testimony was erroneously admitted because a witness may not give a direct opinion as to the truthfulness of another witness.  We agree, and the State concedes that admission of this testimony was error.  As we have previously noted, both lay and expert opinions as to the truthfulness of another witness invade the province of the jury and are inadmissible. *Arzaga v. State*, 86 S.W.3d 767, 776 (Tex.App. – El Paso 2002, no pet.) (a direct opinion as to the truthfulness of another witness "is inadmissible because it does more than assist the trier of fact to understand the evidence or to determine a fact in issue; it impermissibly decides an issue for the jury"); *see Brookins v. State*, No. 08-10-00242-CR, 2011 WL 6357786, at *2 (Tex.App. – El Paso Dec. 14, 2011, pet. ref'd) ("A witness may not give a direct opinion as to the truthfulness of another witness."); *see also Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011) (expert testimony that a particular class of persons to which the victim belongs is truthful is inadmissible);

4

*Yount v. State*, 872 S.W.2d 706, 712 (Tex.Crim.App. 1993) ("We hold that Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful.").

**HARM ANALYSIS**

Thus, we proceed to determine if the admission of this testimony was harmful to Appellant. The erroneous admission of testimony regarding the truthfulness of a witness is non-constitutional error, which must be disregarded unless it affected the defendant's substantial rights. *See Barshaw,* 342 S.W.3d at 93; *see also* TEX.R.APP.P. 44.2(b). We must reverse a conviction for non-constitutional error if we have "grave doubt" that the result of the trial was free from the substantial effect of the error. *Barshaw,* 342 S.W.3d at 94. On the other hand, we will not reverse if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or influenced the jury only slightly. *Id*. at 93. Our focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect on the jury's verdict. *Id*. at 93-94. In assessing the likelihood that the jury's decision was improperly influenced, we must make "a full harm analysis based on the entirety of the record[.]" *Id*. at 96. In doing so, we examine everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the error and how it relates to the other evidence in the case, the theory of the prosecution and defense, the jury instructions, the closing arguments, and whether the state emphasized the error. *Id.* at 94.

Appellant argues "this was an extremely close case," as shown by its procedural history. He points out that the first attempt to try this case ended in mistrial after the jury could not reach a

5

verdict, despite being given an *Allen* charge.[5]   Then, in the second trial the jury reached a verdict

only after first indicating they were deadlocked.   Appellant also notes the jury reached what he

describes as a "solomonesque verdict," finding him guilty on the penetration count but not guilty

on the contact count.   Appellant also points out the verdict was unsupported by any physical

evidence and thus turned on the credibility of the complaining witness.   He contends this "case

stood on a razor's edge, and even with double bolstering of the complaining witness, barely fell on

the State's side."   He asserts the State compounded the error when it argued in closing:

> You also got to hear from Detective Alvarez, Crimes Against
> Children detective.   He said yes, I talked to her at the time I got a
> chance to look at her she seemed credible.   Detective Nevarez, I got
> [a] chance to look at her at the time, I believed her.[6]

Appellant is correct that A.M.'s credibility was a key issue due to the absence of

corroborating evidence such as physical evidence or eyewitness testimony.   *See Rhodes v. State*,

308 S.W.3d 6, 11 (Tex.App. – Eastland 2009, pet. dism'd) (recognizing credibility was a key issue

"because of the absence of corroborating evidence such as physical evidence or eye-witness

testimony").   That the case against Appellant rested on the credibility of the complainant,

however, "is significant, but it is not conclusive."   *Schutz v. State*, 63 S.W.3d 442, 446

(Tex.Crim.App. 2001).

The inadmissible testimony here was only a small portion of a large amount of evidence

presented to the jury from which it could have considered in assessing A.M.'s credibility.   "Even

in cases in which credibility is paramount, Texas courts have found harmless error when the

inadmissible expert testimony was only a small portion of a large amount of evidence presented

---

[5] *Allen v. U.S.*, 164 U.S. 492 (1896).
[6] We also note the State argued earlier:   "you've heard two detectives that [sic] testified about [A.M.'s] credibility."
And, later the State indirectly argued that it had produced witnesses "who never met [A.M.] before in their life, and
they said I believe that little girl, and I think you believe her too."

6

that the jury could have considered in assessing the victim's credibility." *Barshaw*, 342 S.W.3d at 96; *see Schutz,* 63 S.W.3d at 446 ("Suffice it to say, the inadmissible expert testimony was a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility."). This was not a case in which a young child testifies briefly about the crime and is subject to little or no cross-examination. A.M. was 17 at the time of trial and testified at length on exactly what happened that night, giving the jury a significant opportunity to see, hear, and judge her credibility from her testimony alone. The jury was also able to test A.M.'s credibility by comparing her testimony with the accounts of the events she gave to Detective Alvarez, Detective Nevarez, the sexual assault nurse, and the 911 operator. Moreover, defense counsel subjected A.M. to a lengthy and rigorous cross-examination that probed deeply into the various inconsistencies in A.M.'s story. By comparison, the statements of Detective Alvarez and Detective Nevarez were short and to the point, and made without elaboration.[7] *See Rhodes*, 308 S.W.3d at 11 (where the court found the error harmless in part because the witness answered only two questions affirmatively and without elaboration). Because the jury had ample opportunity to judge A.M.'s credibility from evidence independent of the detectives' opinions as to her truthfulness, we conclude the evidence did not have a substantial or injurious effect or influence in determining the jury's verdict. *See Arzaga*, 86 S.W.3d at 777 (concluding there was no harm because the jury had ample opportunity to judge the credibility of the witness independent of the erroneously-admitted opinion on truthfulness).

---

[7] We note that generally those cases in which the courts have found harm have involved rather extensive scientific and statistical testimony from expert witnesses regarding the truthfulness of sexual abuse victims. *See, e.g., Wiseman v. State*, 394 S.W.3d 582, 584-86 (Tex.App. – Dallas 2012, pet. ref'd) (where expert witness gave a "statistical opinion on the truthfulness of sexual abuse complainants").

7

Likewise, the prosecutor's reference in closing argument to Detectives Alvarez' and Nevarez' testimony that they found A.M. truthful and credible, was but a small portion of the prosecutor's closing, which emphasized all the other reasons the jury should believe A.M. *See Rhodes*, 308 S.W.3d at 11 (where the court found the error harmless in part because the State's closing argument primarily addressed other reasons the complainant was credible and made only minimal reference to the improper testimony). The prosecutor emphasized instead the consistency of A.M.'s story, the 911 call, the sexual assault nurse testimony, the medical records, and the testimony of A.M.'s sister about experiencing a similar incident with Appellant. Although the prosecutor's reference may have arguably had some tendency to reinforce the improper testimony, the jury was properly instructed that it was the exclusive judge of witness credibility. *See Barshaw*, 342 S.W.3d at 96 (noting the jury was instructed that it was the sole judge of the witnesses' credibility); *Brookins*, 2011 WL 6357786, at *3.

But, most important, Appellant's reliance on the jury finding him guilty on the penetration case but not guilty on the contact case is misplaced. In fact, the jury's acquittal in one case and conviction in the other shows the jury did not unconditionally believe the complainant and did not allow the testimony as to her credibility to supplant its own decision. The Court of Criminal Appeals addressed this issue in *Schutz v. State*. There, the appellant was tried for aggravated sexual assault of his six-year-old daughter, and the trial court erred in allowing expert testimony concerning the truthfulness of the complainant. 63 S.W.3d at 443. The jury acquitted the appellant of aggravated sexual assault by penetration and convicted him of aggravated sexual assault by contact. *Id.* In analyzing the harm analysis performed by the court below, the Court of Criminal Appeals noted the jury had acquitted the appellant in one case and convicted him in

8

another, "so it is apparent that the jury believed some of the complainant's testimony but not all of it[.]" *Id*. at 445. The Court recognized that even though this inconsistency could be explained away by reasoning there was more evidence to support a conviction on the contact charge than on the penetration charge, "the acquittal nevertheless shows that the jury did not unconditionally believe the complainant" and "is inconsistent with an acceptance of the child's credibility." *Id*. Consequently, "[g]iven the significance of the acquittal, the record does not support a finding that the jury allowed the expert testimony [as to the complainant's truthfulness] to supplant its own decision." *Id*. Likewise in the present case, the jury's acquittal on the contact count demonstrated that the erroneously-admitted testimony did not supplant its own decision regarding A.M.'s credibility.

## CONCLUSION

After conducting a full harm analysis of the entire record, we conclude the erroneously-admitted testimony did not affect Appellant's substantial rights and the error was harmless. We overrule all of Appellant's issues and affirm the conviction.

The trial court certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX.R.APP.P. 25.2(d). The certification is defective. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX.R.APP.P. 48.4, 68. Appellant's attorney is further ORDERED to comply with all of the requirements of TEX.R.APP.P. 48.4.

9

STEVEN L. HUGHES, Justice

January 30, 2015

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

10

Print this page

# Case # PD-0232-15

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 04/01/2015 08:20:36 PM |
| Case Number | PD-0232-15 |
| Case Description | |
| Assigned to Judge | |
| Attorney | Charles Roberts |
| Firm Name | Charles L. Roberts, Attorney at Law |
| Filed By | Charles Roberts |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | Bank of America |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | |
| Order # | |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFileAndServe |
| Filing Code | Petition for Discretionary Review |
| Filing Description | Petition for Discretionary Review-Robert Anthony Cantu with Appendix 1 Eighth Court of Appeals Opinion |
| Reference Number | |
| Comments | |
| Status | Rejected |

## Fees

| Court Fee | $0.00 |
|---|---|
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 04/02/2015 01:23:38 PM | The petition for discretionary review does not contain the identity of Judge, Parties and Counsel [Rule 68.4(a)]. You have ten days to tender a corrected petition for discretionary review. |

## Documents

| | | |
|---|---|---|
| *Lead Document* | PDR -ROBERT CANTU.pdf | [Original] |
| *Attachments* | OPINION CANTU.pdf | [Original] |

## eService Details

| Name/Email | Firm | Service Type | Status | Served | Date/Time Opened |
|---|---|---|---|---|---|
| Jaime Esparza daesparza@epcounty.com | | EServe | Sent | Yes | Not Opened |